UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
_____
                              :
GRACE M. JEFFERSON and JAMES  :
JEFFERSON,                    :
                              :        Civil Action No.
              Plaintiffs,     :        08-cv-6269 (NLH)(KMW)
                              :
     v.                       :        OPINION
                              :
TOWNSHIP OF MEDFORD, et al.,  :
                              :
              Defendants.     :
_____:
```

**APPEARANCES**:

Joseph P. Grimes, Esquire
Grimes & Grimes, LLC
1230 Brace Road
Cherry Hill, NJ 08034-3211
*Attorney for Plaintiffs Grace M. Jefferson and James Jefferson*

Richard L. Goldstein, Esquire
Marshall, Dennehey, Warner, Coleman & Goggin, PA
Woodland Falls Corporate Park
200 Lake Drive East
Suite 300
Cherry Hill, NJ 08002
*Attorney for Defendants Township of Medford, Medford Township Police Department, Chief of Police James S. Kehoe, Corporal Robert Zane, and Sergeant Gary Lang*

**HILLMAN, District Judge**

     Plaintiffs, Grace M. Jefferson and James Jefferson, allege that Defendants, the Township of Medford (or, "Township"), the Medford Township Police Department, Chief of Police James S. Kehoe, Corporal Robert Zane, and Sergeant Gary Lang, violated their constitutional rights when Grace Jefferson was physically injured by Officers Zane and Lang.  In response to Plaintiffs'

claims, Defendants move for summary judgment.

For the reasons expressed below, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I.   JURISDICTION

Plaintiffs have brought federal constitutional claims pursuant to 42 U.S.C. § 1983, as well as claims under New Jersey law.  The Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, and may exercise supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

## II.  BACKGROUND[1]

On the afternoon of December 5, 2006, Grace M. Jefferson (or, "Jefferson") was extremely upset about ongoing proceedings involving one of her daughters.  Jefferson's youngest daughter had previously reported that James Jefferson, Grace Jefferson's husband, had inappropriately touched her.  The Burlington County Prosecutor's Office and the Division of Youth and Family Services investigated the allegations.  As a result of the investigation,

---

[1] The following facts are derived primarily from Plaintiffs' complaint and the deposition testimony of Grace Jefferson, Krisden McCrink, Corporal Zane, Sergeant Lang, and Chief of Police Kehoe.

Moreover, given that the present matter comes before the Court by way of Defendants' Motion for Summary Judgment, Plaintiffs' evidence "is to be believed and all justifiable inferences are to be drawn in [their] favor."  See Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

Jefferson's two minor daughters were removed from her home and placed in the care of Jefferson's adult daughter.

On the day in question, Jefferson returned to her home after her appointment with a detective involved in her daughter's case was canceled. At home in Medford Township, Jefferson was hysterical, exclaiming her displeasure with the detective and the proceedings in general. She then returned to her vehicle, raced out of the driveway, and drove away abruptly from her residence. Having observed her screaming, crying, and cursing, James Jefferson knew that his wife was upset. Concerned for Jefferson's well-being, James contacted the Medford Township Police Department. Corporal Robert Zane and Sergeant Gary Lang were dispatched to find and check on Jefferson and to ensure her safety.

When Officer Zane found her vehicle parked in a parking lot, Jefferson was inside, talking to Krisden McCrink, her husband's attorney, on a cellular phone. Zane approached Jefferson's vehicle and spoke to her through the open driver's side window. After some banter, Zane asked Jefferson if there was anything he could do to help. Jefferson explained that her problems involved the Medford Township Police Department and a detective in particular. The two individuals then went back and forth, debating the identity and existence of the detective with growing intensity. Jefferson felt that Zane was attempting to draw her

3

into an argument, and grew angry and agitated.  Finally, Jefferson offered her cell phone to Zane so that he could speak with McCrink.

While she handed the phone to Zane, Jefferson began to open her door to step out of the car.  She denies that the vehicle door contacted the officer.  In response to her action, Zane closed the door on Jefferson, pinning her against the vehicle.  Thereafter, he grabbed her around the neck, dragged her from the vehicle, and pushed her to the ground.  Zane shouted at Jefferson that she struck him with the door and that she was going to jail.  While on the ground, Jefferson's arms were pinned beneath her.[2]  Zane grabbed Jefferson's hair, pulled back her head, and then pushed and grinded her face on the ground.

At some point, Officer Lang and another officer had arrived at the scene, and Lang handcuffed Jefferson while she was lying in the parking lot.  While attempting to handcuff Jefferson, one of the officers twisted her arm and tore cartilage in her left shoulder.  After handcuffing her, the officers helped Jefferson to her feet, but Zane shoved her back to her knees.  According to Jefferson, "[Zane] told me I couldn't get up unless I was going

---

[2] At her deposition, Jefferson could not recall whether she was kicking her legs while she was being held on the ground by Zane.  She testified, however, that she repeatedly lifted her head to prevent Zane from forcing it downward onto the pavement and grinding her forehead.

4

to act like a lady."[3]  (Def. App., Exh. B, at 75).  As a result of the altercation, Jefferson's face was bloodied, handfuls of hair were tugged from her head, and she suffered significant injuries to her neck and shoulder, the latter requiring surgery.

Defendants proffer a different version of the relevant events.  Officer Zane recalled approaching the vehicle and observing Jefferson speaking on her cell phone.  According to Officers Zane and Lang, Jefferson screamed profanities and expressed how upset she was about the circumstances surrounding her children, the police, and the detective she was supposed to meet that day.  To pacify the situation, Zane offered to speak with Jefferson's attorney.  Jefferson thrust the phone toward Zane and opened her vehicle's door.  The door struck Zane in the forearm, jarring the cell phone out of his hands and knocking him backward.  Zane testified at his deposition that the door was swung open "in a forceful manner" and that he understood Jefferson to be acting in such a way as to intentionally hit him with the door, which he blocked with his forearm.  (Def. App., Exh. C, at 22).  Lang, who was also at the scene, corroborated that Jefferson hit Zane with the door.

---

[3] Similarly, during the scuffle, McCrink, who was still listening on the cell phone, heard Zane say to Jefferson, "Oh, you mother fu . . . ," and later shout at her, "You want to be a lady now?  Are you going to act like a lady?"  (Def. App., Exh. D, at 38, 46).  Finally, McCrink heard Zane tell Jefferson that she was going to jail.

Zane then attempted to gain control over Jefferson.  He applied, as he characterized, "a common arm bar takedown procedure," and forced Jefferson to the ground.  (Def. App., Exh. C, at 25).  While on the ground, the officers recalled, Jefferson whipped her head back and forth, kicked her legs, and resisted arrest, despite the officer's requests that she stop.  Lang assisted in handcuffing Jefferson.  Zane testified that Jefferson flailed and struck her own head on the gravel and that he and Lang attempted to subdue her head to prevent Jefferson from causing any further injuries to herself.  Zane denied that he ever placed Jefferson in a headlock, or that he grabbed and pushed Jefferson's head onto the ground, thereby causing any lacerations.[4]

On or around December 1, 2008, Grace and James Jefferson filed suit in the Superior Court of New Jersey alleging the violation of their federal and New Jersey constitutional rights. In particular, they claim that (1) Officers Zane and Lang employed excessive force and intentionally, willfully, and maliciously injured Grace Jefferson; and that (2) the Township of Medford, the Medford Township Police Department, and Chief of Police James S. Kehoe, have fostered a pattern and practice of

---

[4] Jefferson, in turn, denied that she was thrashing on the ground and that her injuries were self-inflicted.  She also denied that she ever cursed at the officers, except when Zane was choking her and banging her head on the ground.

deliberate indifference toward the use of excessive force by its police officers, failing to properly train, supervise, or discipline those officers for their misconduct.

On or around December 22, 2008, Defendants removed the case to this Court.  Further, on or around March 22, 2010, Defendants moved for summary judgment against Plaintiffs' claims.

## III. DISCUSSION

### A.    Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and

all justifiable inferences are to be drawn in his favor." <u>Marino v. Indus. Crating Co.</u>, 358 F.3d 241, 247 (3d Cir. 2004) (quoting <u>Anderson</u>, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. <u>Celotex Corp.</u>, 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. <u>Id.</u> Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. <u>Anderson</u>, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. <u>Saldana v. Kmart Corp.</u>, 260 F.3d 228, 232 (3d Cir. 2001).

**B.   Medford Township Police Department**

In their complaint, Plaintiffs name the Medford Township Police Department as a defendant in addition to the Township itself. Defendants correctly posit, however, that the Police Department is not a proper defendant in this case. <u>See</u> <u>Padilla v. Twp. of Cherry Hill</u>, 110 F. App'x. 272, 278 (3d Cir. 2004) ("In Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is

not a separate judicial entity." (citation and internal quotation marks omitted)); see also Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 n.4 (3d Cir. 1997) ("As in past cases, we treat the municipality and its police department as a single entity for purposes of section 1983 liability."); N.J.S.A. 40A:14-118 (declaring that New Jersey police departments are "an executive and enforcement function of municipal government").  Plaintiffs offer no rebuttal and appear to cede to Defendants' assertion.

Therefore, the Medford Township Police Department is dismissed as a party in this action.

### C.   42 U.S.C. § 1983

Plaintiffs allege a series of federal constitutional violations under several provisions of the United States Constitution, particularly the Fourth, Fifth, Eighth, and Fourteenth Amendments.  Defendants dispute all of those assertions.  Beginning with their Fourth Amendment claim, the Court will address each of Plaintiffs' federal claims in turn.

### 1.   Alleged Violations of the Fourth Amendment by the Township of Medford and Chief of Police James S. Kehoe

Defendants argue that Plaintiffs cannot sustain a Section 1983 claim against the Township or Chief Kehoe because they cannot demonstrate any municipal policies or customs that caused the alleged harms borne by Grace Jefferson as a result of the officers' alleged misconduct.  In particular, Defendants assert

that Plaintiffs have not conducted or gathered any discovery that would illustrate the Township's policies or customs, especially in regard to the allegation that Defendants failed to train, supervise, or discipline their officers.

Plaintiffs counter that the Township and Chief Kehoe established a policy or custom of deliberate indifference toward their officers' use of excessive force.  To support their assertion, Plaintiffs explain that Officers Zane and Lang submitted "use of force" reports pertaining to their interaction with Jefferson, and in those reports, the officers included materially false information, such as their assertion that Jefferson injured herself while resisting arrest, and omitted relevant facts, including Zane's use of profanity toward Jefferson.  In addition, Plaintiffs point out that during Chief Kehoe's twenty-six years with the Medford Township Police Department, not a single police officer has ever been disciplined for the use of excessive force in spite of hundreds of arrests. Plaintiffs believe that a genuine issue of material fact exists as to whether the Township and Chief Kehoe have promoted a custom by which officers may document false allegations in their reports and insulate their misconduct from any scrutiny or discipline.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or

> other person within the jurisdiction thereof
> to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and
> laws, shall be liable to the party injured in
> an action at law, suit in equity, or other
> proper proceeding for redress . . . .

42 U.S.C. § 1983.  A municipality, however, cannot be held liable

under Section 1983 for the actions of its agents or employees

under a theory of respondeat superior.  Groman v. City of

Manalapan, 47 F.3d 628, 637 (3d Cir. 1995).  Rather, "[w]hen a

suit against a municipality is based on § 1983, the municipality

can only be liable when the alleged constitutional transgression

implements or executes a policy, regulation or decision

officially adopted by the governing body or informally adopted by

custom." Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir.

1996) (citing Monell v. New York City Dept. of Social Servs., 436

U.S. 658 (1978)).

Accordingly, under Section 1983, a municipality may be

liable for either its policy or custom:

> A government policy or custom can be
> established in two ways.  Policy is made when
> a decisionmaker possessing final authority to
> establish a municipal policy with respect to
> the action issues an official proclamation,
> policy, or edict.  A course of conduct is
> considered to be a "custom" when, though not
> authorized by law, such practices of state
> officials are so permanently and well-settled
> as to virtually constitute law.

McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009)

(citations, internal quotation marks, and brackets omitted).

11

"Custom requires proof of knowledge and acquiescence by the decision-maker." Id.  Additionally, "[a] plaintiff bears the burden of proving that the municipal practice was the proximate cause of the injuries suffered." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990).  To do so, "a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Id. (citations omitted); see Moleski v. Cheltenham Twp., 2002 U.S. Dist. LEXIS 12311, at **43-44 (E.D. Pa. Apr. 30, 2002) ("In failure to train, supervise, or investigate contexts, the casual link must connect the deficient training, supervisory or investigatory programs and the constitutional injury, otherwise it would 'open municipalities to unprecedented liability under § 1983' and subject them to 'de facto respondeat superior liability.'" (quoting City of Canton v. Harris, 489 U.S. 378, 391-92 (1989))).  The issue of proximate causation is often reserved for the jury unless "the casual link is too tenuous." Bielevicz, 915 F.2d at 851.

Here, Plaintiffs do not point to an explicit or affirmative policy.  Instead, they allege that the Township and Chief Kehoe, its decision-maker in this context, failed to properly train, supervise, and discipline their officers in regard to the use of excessive force.  To establish a Section 1983 cause of action against a municipality for failure to train, supervise,

investigate, or discipline its police officers, the plaintiff must show that the municipality was deliberately indifferent to the constitutional rights of its inhabitants.  <u>Groman</u>, 47 F.3d at 637; <u>see</u> <u>Tobin v. Badamo</u>, 78 F. App'x 217, 219 (3d Cir. 2003) ("A municipality may be held liable under section 1983 when its failure to supervise police officers reflects a policy of deliberate indifference to constitutional rights." (citations and internal quotation marks omitted)).

Concerning this Section 1983 claim, Plaintiffs fail to present any evidence that would spawn a genuine issue of material fact.  The gravamen of Plaintiffs' Section 1983 claim against the Township and Chief Kehoe is that (1) two officers fabricated the events surrounding Jefferson's arrest and the municipality, and its chief of police, did nothing to verify the veracity of the officers' accounts; and (2) in twenty-six years, no police officer in the municipality has been disciplined for the use of excessive force.  Neither of those assertions, alone or in conjunction with one another, establishes that a custom of deliberate indifference permeated the Township, with the acquiescence or tacit approval of Chief Keloe.

First, with respect to the use of force reports submitted by Officers Zane and Lang, nothing in the record demonstrates that the Township did not properly review the officers' submissions, or did so in a manner evincing deliberate indifference.

13

Moreover, assuming <u>arguendo</u> that the officers' reports are materially inaccurate and that the Township failed to properly review them, one episode of unconstitutional activity does not engender a policy or custom of deliberate indifference sufficient to sustain a Section 1983 cause of action against a municipality. <u>See Groman</u>, 47 F.3d at 637 ("This case <u>standing alone</u> does not provide sufficient proof of a policy or custom to satisfy the dictates of § 1983." (emphasis added)); <u>see also</u> <u>Hammock v. Borough of Upper Darby</u>, 2007 U.S. Dist. LEXIS 80493, at *29 (E.D. Pa. Oct. 31, 2007) (noting that "'a single incident of unconstitutional activity is not sufficient to impose liability under Monell'" (quoting <u>Oklahoma City v. Tuttle</u>, 471 U.S. 808, 823-24 (1985))).

Second, the simple, naked fact that no police officer has been disciplined for the use of excessive force in the Township during the past twenty-six years does not demonstrate deliberate indifference towards citizens' civil rights. <u>See</u> <u>Strauss v. City of Chicago</u>, 760 F.2d 765, 768-69 (7th Cir. 1985) (finding statistics alone insufficient to prove municipal liability because "[p]eople may file a complaint for many reasons, or for no reason at all"); <u>Brown v. New Hanover Twp. Police Dept.</u>, 2008 U.S. Dist. LEXIS 71434, at *44 (E.D. Pa. Sept. 22, 2008) ("Rather than reciting a number of complaints or offenses, a Plaintiff must show why those prior incidents deserved discipline and how

14

the misconduct in those situations was similar to the present one."). After all, the record is silent as to whether any excessive force complaints have ever been filed against the Township's police officers, thereby warranting an investigation, and if so, whether any of those complaints were potentially valid.

Moreover, absent any further evidence, Plaintiffs cannot establish that the Township and Chief Kehoe's actions in any way caused the harm that Grace Jefferson suffered by virtue of the actions of Officers Zane and Lang. There is not a scintilla of evidence to affirmatively link any policies, practices, or customs of the Township and its chief of police to the officers' alleged unconstitutional activity.

With respect to the Section 1983 claim against Chief Kehoe in his individual capacity, Plaintiffs, again, fail to create a genuine issue of material fact. "A defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Id. "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Id.

15

The most damning evidence that Plaintiffs present against Chief Kehoe is that he has been with the Medford Township Police Department for approximately twenty-six years and that during that time no police officers have been disciplined for the use of excessive force.  That fact, alone or in conjunction with Plaintiffs' other arguments, fails to show that Chief Kehoe directed, had actual knowledge of, or acquiesced to the officers' alleged misconduct in this case.  In fact, in regard to Kehoe's twenty-six years with the Police Department, it is worth noting that he has served as chief of police or acting chief of police for only about three of those years.

For the reasons expressed above, Defendants are granted summary judgment against Plaintiffs with respect to Plaintiffs' Section 1983 claims against the Township of Medford and Chief Kehoe.

### 2.   Alleged Violations of the Fourth Amendment by Officers Zane and Lang

Corporal Zane and Sergeant Lang argue that they are entitled to qualified immunity against Plaintiffs' Fourth Amendment claims based on the alleged use of excessive force.  During their interaction with Grace Jefferson, the officers claim, Jefferson struck Officer Zane with her vehicle's door.  In response, Officer Zane attempted to gain control over Jefferson and took her to the ground, where the officers effectuated their arrest.  During this time, the officers submit that Jefferson resisted and

16

flailed on the ground, substantially causing her own injuries.
Based on these facts, Defendants surmise that Plaintiffs cannot
sustain a Section 1983 claim for excessive force.

Plaintiffs counter that they have created a genuine issue of
material fact concerning the officers' actions.  Were a
reasonable fact-finder to believe Jefferson's account of the
events, Plaintiffs opine, then Officers Zane and Lang would have
committed clearly established constitutional violations and, for
that reason, are not entitled to qualified immunity.

For the sake of simplicity and clarity, the Court will
address Plaintiffs' claims against Corporal Zane and Sergeant
Lang independently.

### a.   Corporal Zane

To state a claim under Section 1983, a plaintiff must show
that: (1) the conduct challenged was committed by a person acting
under color of state law; and (2) that the conduct deprived her
of her rights, privileges, or immunities secured by the
Constitution or laws of the United States.  See Shuman ex rel.
Shertzer v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir.
2005).  However, "'[t]he doctrine of qualified immunity protects
government officials from liability for civil damages insofar as
their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known.'"  Montanez v. Thompson, 603 F.3d 243, 249-50 (3d Cir.

17

2010) (quoting <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S. Ct. 808, 815 (2009)).  Qualified immunity may shield a government official from liability regardless of whether the official's conduct constituted a mistake of law, of fact, or a combination of the two.  <u>Id.</u> at 250.  To determine the applicability of qualified immunity, a court must undertake a two-step inquiry:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was clearly established at the time of a defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.[5]

<u>Id.</u> (citing <u>Pearson</u>, 129 S. Ct. at 815-16).  "Where a defendant asserts a qualified immunity defense in a motion for summary judgment, the plaintiff bears the initial burden of showing that the defendant's conduct violated some clearly established statutory or constitutional right."  <u>Sherwood v. Mulvihill</u>, 113 F.3d 396, 399 (3d Cir. 1997).  "Only if the plaintiff carries this initial burden must the defendant then demonstrate that no genuine issue of material fact remains as to the 'objective reasonableness' of the defendant's belief in the lawfulness of

---

[5] Although the aforementioned sequence of the qualified immunity analysis is often appropriate, it is not rigid and inflexible; rather, a court may exercise its discretion in deciding which of the two prongs should be addressed first in light of a case's particular circumstances.  <u>Montanez</u>, 603 F.3d at 250 (quoting <u>Pearson</u>, 129 S. Ct. at 818).

his actions." Id. (citation omitted).

At the outset, the Court looks to determine whether the evidence against Officer Zane may show the violation of a constitutional right.  Grace Jefferson avers that Zane violated the Fourth Amendment by employing excessive force against her. In determining whether excessive force was used, the Fourth Amendment's "objective reasonableness" test is applied.  Sharrar v. Felsing, 128 F.3d 810, 820-21 (3d Cir. 1997) (citing Graham v. Connor, 490 U.S. 386, 397 (1989)).  The objective reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. at 821 (quoting Graham, 490 U.S. at 396).  "Other relevant factors include the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  Id. at 822.

In evaluating the proper test for objective reasonableness, the Supreme Court has provided that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's

chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (internal citation and quotation marks omitted).  Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."  Id.

Antecedent to the physical altercation between Officer Zane and Grace Jefferson, both parties agree to the basic facts.  For example, both parties acknowledge that James Jefferson summoned the Medford Township Police Department and requested that someone check on his wife, who was extremely upset and agitated over circumstances involving her family and law enforcement. Similarly, it is undisputed that Zane approached Jefferson in her parked vehicle and that Jefferson handed Zane her cell phone so that he could speak to McCrink.  There is a discrepancy, however, in the events that follow Jefferson's willingness to turn over her phone.  For the sake of this motion, the Court must credit Jefferson's version.

Grace Jefferson testified during her deposition that as she handed her cell phone to Zane, she opened her vehicle's door but did not contact Zane with it.  Nevertheless, according to Jefferson, Zane pinned her against the vehicle with the door and then applied a kind of choke hold on her before throwing her onto

20

the pavement.  Once on the ground, Jefferson recalls that Zane, twice, grabbed her by the hair, pulled back her head, and slammed it against the ground.  He then grinded her head against the coarse surface.  To that point, Jefferson testified:

> Then while [Zane] was holding me down on the ground he grabbed the back of my hair and repeatedly pulled my head back and smashed my face into the ground.  And then pushed my face into the parking lot and was grinding my face while I was trying to keep my face up off the parking lot, he was trying to push it down and grind my face into the blacktop.

> . . . .

> I was trying to keep my head up when he was pushing it down and grinding it into the pavement because it hurt.  And he was pulling my head back and slamming it into the ground.

(Def. App., Exh. B, at 64, 66).  Defendants' counsel asked Jefferson:  "It's your testimony that this officer grabbed your head from behind and slammed it into the ground?"  (Id. at 66). Jefferson responded, "Yes," adding that on two occasions Zane thrust her head into the ground and "then ground it, then was pushing it down and grinding it, grinding my face into the pavement."  (Id. at 67).

Accepting these facts as true, the Court finds that Jefferson could establish a valid claim for excessive force against Officer Zane.  Even if she was being arrested for contacting Zane with the door -- an event that she denies

21

happened -- a reasonable fact-finder could conclude that Zane's
use of force was objectively unreasonable under the particular
set of circumstances.  Other than her sour attitude toward the
police and the possibility that she may have hit Zane with her
vehicle's door, nothing in the record suggests that Jefferson
posed a specially violent or dangerous threat to the police.  The
officers' initial interaction with Jefferson was inspired by a
concern for her welfare, not an accusation that she had committed
a crime.  Further, she was not armed, nor accompanied by anyone
else who could have endangered the officers.  Moreover, once she
was on the ground and Zane was in the midst of arresting her with
other officers present, there was no threat that Jefferson would
flee, and any harm that Jefferson could have inflicted was all
but nullified.

A jury may find that Zane applied a choke hold on Jefferson
and that, under the circumstances of this case, such a maneuver
was unreasonable.  Moreover, it is fair to assume that if Zane
had pinned Jefferson to the ground, grabbed her hair, yanked her
head backwards, and then concussed and grinded her head against
the ground, those actions also could be deemed excessive.  See
Green v. N.J. State Police, 246 F. App'x 158, 161-62 (3d Cir.
2007) (holding that a reasonable jury could find an
unconstitutional use of excessive force where police officers
grabbed an arrestee by the throat, hit him on the head twice with

22

a flashlight, and kneed and kicked him after he was thrown to the ground).  There is a genuine issue of material fact whether Jefferson was resisting arrest by flailing her head and limbs, but that possibility, in and of itself, does not necessarily justify an officer to intentionally strike a restrained person's head against the ground, which is what Jefferson alleges.

That being said, the Court recognizes that a fact-finder may determine the actual events of that day more closely hew to those told by Officers Zane and Lang.  Whereas Jefferson avers that Zane maliciously choked her and then grabbed her head to slam and grind it against the ground, the truth may be, as Zane recalled, that he forced her to the ground by her arm and, once on the ground, simply attempted to hold Jefferson's head in place so that she could not thrash around and scuff her head against the ground herself.  However, the stark distinction between these two versions of events engenders a factual dispute that may or may not give rise to excessive force.  Only the fact-finder can reach that ultimate determination.  But, for purposes of summary judgment, Jefferson avers facts that, if accepted, are sufficient to prove excessive force.

Of course, the qualified immunity analysis does not end there.  Even if Zane's actions violated a constitutional right, the question remains whether at the time of the incident, Jefferson's rights in this specific context were "clearly

23

established," and "[t]o conclude that a right is 'clearly

established,' '[t]he contours of the right must be sufficiently

clear that a reasonable official would understand that what he is

doing violates that right.'" <u>Green</u>, 246 F. App'x at 162 (quoting

<u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).  "Thus, the

relevant, dispositive inquiry in determining whether a right is

clearly established is whether it would be clear to a reasonable

officer that his conduct was unlawful in the situation he

confronted."[6]  <u>Id.</u> (citation, internal quotation marks, and

brackets omitted).  "Officers who make reasonable mistakes as to

what the law requires are entitled to qualified immunity, which

operates . . . to protect officers from the sometimes hazy border

between excessive force and acceptable force."  <u>Id.</u> (citation and

internal quotation marks omitted).

Deciding the second step of the qualified immunity analysis

when there are disputed facts with regard to the first step, in

practical effect, requires the Court to go ahead and consider the

first step anyway.  The Third Circuit recognized this "degree of

duplication inherent" in the two-part scheme, noting that "the

_____

[6] The Third Circuit "has adopted a broad view of what
constitutes an established right of which a reasonable person
would have known," and has "held that there does not have to be
'precise factual correspondence' between the case at issue and a
previous case in order for a right to be 'clearly established,'
and we would not be 'faithful to the purposes of immunity by
permitting . . . officials one liability-free violation of a
constitutional or statutory requirement.'"  <u>Kopec v. Tate</u>, 361
F.3d 772, 778 (3d Cir. 2004) (citations omitted).

24

question whether the amount of force an officer used was
unreasonable and violated the Fourth Amendment may be viewed as
blending somewhat into the question whether the officer
reasonably believed that the amount of force he used was lawful."
Bennett v. Murphy, 120 F. App'x 914, 917 (3d Cir. 2005) (citation
and internal quotation marks omitted); see Curley v. Klem, 499
F.3d 199, 214 (3d Cir. 2007) ("Confusion between the threshold
constitutional inquiry and the immunity inquiry is also
understandable given the difficulty courts have had in
elucidating the difference between those two analytical steps.").

Even though the determination of "whether an officer made a
reasonable mistake of law, and is thus entitled to qualified
immunity, is a question of law that is properly answered by the
court, not a jury," the Third Circuit has recognized that a judge
could "decide the objective reasonableness issue once all the
historical facts are no longer in dispute." Curley, 499 F.3d at
211 & n.12. To do this, "[a] judge may use special jury
interrogatories, for instance, to permit the jury to resolve the
disputed facts upon which the court can then determine, as a
matter of law, the ultimate question of qualified immunity." Id.
at 211 n.12. In other words, "[w]hen the ultimate question of
the objective reasonableness of an officer's behavior involves
tightly intertwined issues of fact and law, it may be permissible
to utilize a jury in an advisory capacity, . . . but

25

responsibility for answering that ultimate question remains with the court." Id. (internal citation omitted); see id. at 225-26 (Roth, J., dissenting) ("[I]f factual disputes relevant to [the step-two] legal analysis do exist, the court will have to postpone making this determination until the jury resolves all the relevant factual disputes, because determining what actually happened is a prerequisite to determining whether the law clearly established that a particular action was permitted or prohibited by the Fourth Amendment under those circumstances.  After the jury resolves these relevant fact disputes, presumably through the use of special interrogatories, the court is then capable of deciding whether or not the law clearly permitted or prohibited the conduct constituting the constitutional violation." (internal citations omitted)); see also Lawson v. McNamara, 2010 U.S. Dist. LEXIS 120645, at *12 (E.D. Pa. Nov. 12, 2010) ("Where there are unresolved disputes regarding historical facts, '[a] decision on qualified immunity will be premature.'" (quoting Curley, 298 F.3d at 278)).

Given the factual disparity between the parties' accounts, the Court cannot answer the second inquiry of the qualified immunity analysis at this time.  The apparency of the constitutional violation at issue in this case to a reasonable police officer hinges on which version of events is accepted by the jury.  Should the jury find that Zane employed excessive

force by intentionally choking Jefferson, or blatantly driving Jefferson's head into the ground and grinding it against the parking lot's surface even though she was immobilized on the ground, then the unlawfulness of Zane's actions may be readily apparent to an objectively reasonable police officer. On the other hand, the jury may find other facts, or a combination thereof, that would entitle Zane to qualified immunity as a matter of law. Accordingly, if and when the time arrives, the Court will employ special interrogatories, as is necessary, to determine, as a matter of law, whether Zane is shielded by the principles of qualified immunity. But, on the present record and accepting Jefferson's testimony as true, Zane may have committed a constitutional violation by using excessive force, and the Court, at this time, cannot determine definitively that qualified immunity should exonerate him.

Therefore, Plaintiffs' Section 1983 claim against Officer Zane may proceed.[7]

### b.    Sergeant Lang

As for Sergeant Lang, the foregoing analysis will not suffice. While Jefferson continuously refers in her complaint to

---

[7] Though the parties dispute whether an immediate, interlocutory appeal is available on the issue of qualified immunity, the Court leaves it to the parties to interpret the relevant law and decide the matter for themselves. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1945-46 (2009) (explaining the appealability of a district court's decision on qualified immunity).

the physical assault she suffered at the hands of Zane and Lang, it appears that Jefferson herself, at her deposition, admitted that no police officer other than Corporal Zane physically assaulted her.[8]  While Lang did come into contact with Jefferson, it was only to assist in handcuffing her, and no evidence demonstrates that his actions, alone, constituted excessive force or otherwise would strip him of qualified immunity.  To the extent that Lang's involvement in the arrest could render him liable, Plaintiffs fail to properly articulate their claim in light of the evidence proffered or the applicable legal standards.

Ultimately, it is difficult to discern the precise contours of Plaintiffs' claim against Lang.  In the complaint, Jefferson's allegations against Lang conflate with her allegations against Zane, even though only Zane allegedly choked and assaulted Jefferson.  Further, in her opposition brief to Defendants' motion, Jefferson suggests that Lang is culpable not simply because of any actual physical harm he caused to Jefferson, but

---

[8] At her deposition, Jefferson was asked when she first noticed that police officers other than Corporal Zane were at the scene.  Jefferson replied, "When they were handcuffing me." (Def. App., Exh. B, at 70).  Later, when asked if any other officer touched her at the scene, Jefferson stated only that one of the other officers handcuffed her.  To further clarify, Defendants' counsel asked: "Was the extent of your contact with the other officer in the course of your being handcuffed?" (Def. App., Exh. B, at 77).  Jefferson responded, "Yes."  (Id. at 78).

because he was present during Zane's actions and corroborated Zane's factual fabrications in an effort to mask unlawful police misconduct.  Whether those allegations implicate a theory of bystander liability or some other cause of action is debatable, but at the least, no cause of action has been adequately pleaded or otherwise made apparent to the Court.  In the end, Plaintiffs do not sufficiently articulate any facts, produce any evidence, or present any persuasive legal authority to save their claims against Lang from summary judgment.  For those reasons, any claims against Lang must be dismissed.

However, the Court, exercising caution and prudence and recognizing that it is best to adjudicate a claim on its merits, will grant Plaintiffs twenty (20) days from the date of this Opinion to amend their complaint or to otherwise present an argument in support of their claim(s) against Lang.  Plaintiffs should clearly articulate whatever basis of law and fact they rely upon in pursing a claim against Lang.  In turn, Defendants will have twenty (20) days from the date of Plaintiffs' submission to respond.

Therefore, Plaintiffs' claims against Sergeant Lang are dismissed, without prejudice.  If Plaintiffs do not act in accordance with this Opinion and the Court's direction, then its

claims against Lang will be dismissed entirely, with prejudice.[9]

### 3. Alleged Violations of the Fifth, Eighth, and Fourteenth Amendments

Plaintiffs also appear to allege that the use of excessive force by Officers Zane and Lang constitute violations of the Fifth, Eighth, and Fourteenth Amendments. Defendants oppose those assertions.

Simply put, Plaintiffs do not point to any authority that would enable their excessive force claims to proceed under those constitutional provisions, and the precedent uncovered by the Court supports the grant of summary judgment. For example, "[t]he Eighth Amendment prohibits the use of excessive force against those convicted of a crime." James v. York County Police Dep't, 160 F. App'x 126, 131 (3d Cir. 2005) (citing Graham, 490 U.S. at 395 n.10). "The Due Process Clause of the Fourteenth Amendment protects pretrial detainees, those charged with, but not yet convicted of, a crime, from the use of excessive force."

---

[9] Defendants also argue that Plaintiffs' request for punitive damages should be dismissed because Plaintiffs fail to proffer any facts that would prove that Defendants acted with the ill intent or recklessness necessary to award such damages. With respect to Officer Zane, Jefferson's allegations, if true, may sufficiently demonstrate that Zane acted maliciously or with the intent to hurt her needlessly. For that reason, the Court denies Defendants' motion as it relates to Zane. With respect to punitive damages as it applies to all other named defendants, Plaintiffs' request must be dismissed, either for failure to maintain an underlying claim against the defendant or for failing to proffer sufficient evidence to show the requisite intent or misconduct.

Id. (citing Bell v. Wolfish, 441 U.S. 520, 523 (1979)).

Consequently, where a plaintiff alleges the use of excessive force during the course of an arrest, neither the Eighth nor Fourteenth Amendment provides the suitable protection against the use of excessive force.  Id.

To the extent that Plaintiffs attempt to state a cause of action under the "generalized notion of 'substantive due process' under the Fourteenth Amendment," that nebulous claim must fail because "a more explicit textual source of protection, the Fourth Amendment" is available to Plaintiffs, whose claim is predicated upon the officers' treatment of Jefferson while she was being arrested, or seized.  Id. at 131 n.3 (citing Graham, 490 U.S. at 388).  Likewise, under these circumstances, Plaintiffs also have no claim under the Fifth Amendment.  See King v. Ridley Twp., 2007 U.S. Dist. LEXIS 51706, at *9 (E.D. Pa. Jul. 17, 2007) (holding that "the use of excessive force during a seizure does not violate the Fifth Amendment," but rather the Fourth Amendment (emphasis omitted)); see also GEOD Corp. v. N.J. Transit Corp., 678 F. Supp. 2d 276, 288 (D.N.J. 2009) ("[I]t is axiomatic that a plaintiff seeking relief pursuant to the Fifth Amendment must complain of federal government action.")

Therefore, for the reasons stated above, Defendants are granted summary judgment against Plaintiffs with respect to those claims brought under the Fifth, Eighth, and Fourteenth

Amendments.[10]

### D.   New Jersey Civil Rights Act

Their federal claims notwithstanding, Plaintiffs believe that they may proceed on their claims under the New Jersey Civil Rights Act, N.J.S.A. 10:6.1 et seq., because New Jersey's civil rights scheme is broader and more expansive than its federal analogue. Defendants disagree, opining that the state claims must be dismissed for the same reasons as the federal claims.

The New Jersey Civil Rights Act ("NJCRA") "creates a private right of action for the violation of civil rights secured under the New Jersey Constitution." Armstrong v. Sherman, 2010 U.S. Dist. LEXIS 55616, at *15 (D.N.J. Jun. 4, 2010). Accordingly, the NJCRA is the State's analogue to Section 1983 and is often interpreted in virtually the same manner as its federal counterpart. See Chapman v. New Jersey, 2009 U.S. Dist. LEXIS 75720, at *7 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart: Section 1983."); Slinger v.

---

[10] Suffice it to say, summary judgment against Plaintiffs on their Fourteenth Amendment claim is limited to their due process theory and does not relate to the Fourth Amendment's incorporation through the Fourteenth Amendment.  Also, the Court notes that Plaintiffs mention the Sixth Amendment and equal protection in their complaint.  However, there are no facts in the record to support a contention under either of those constitutional provisions, and Plaintiffs do not seem to defend any such claims in their opposition to Defendants' motion. Therefore, to the extent that Plaintiffs sought to advance a cause of action under the Sixth Amendment or the Equal Protection Clause of the Fourteenth Amendment, both are dismissed.

<u>New Jersey</u>, 2008 U.S. Dist. LEXIS 71723, at *15 (D.N.J. Sept. 4, 2008) (stating that the NJCRA "was intended to serve as an analog to [Section 1983]; it was designed to 'incorporate and integrate seamlessly' with existing civil rights jurisprudence"), <u>rev'd in part on other grounds</u>, 366 F. App'x 357 (3d Cir. 2010).

Contrary to Plaintiffs' general assertions, the Court is not convinced that for any of the claims asserted in this case, the New Jersey Constitution or the NJCRA requires a different rule of law or a different outcome than those applied or reached under the Section 1983 analysis, respectively.   In <u>Norcross v. Town of Hammonton</u>, 2008 U.S. Dist. LEXIS 9067 (D.N.J. Feb. 5, 2008), the Honorable Robert B. Kugler explained:

> The New Jersey Supreme Court does not appear to have spoken on whether excessive force is a context where state law provides greater protection than does federal law.  This Court sees no reason to conclude that in the context of a claim for excessive force during an arrest, the standard under the New Jersey Constitution for evaluating those claims is different from that under the United States Constitution.

<u>Id.</u> at *11 (internal citation omitted); <u>see</u> <u>Estate of Awkward v. Willingboro Police Dep't</u>, 2010 U.S. Dist. LEXIS 104304, at *14 n.7 (D.N.J. Sept. 30, 2010) ("Because the analysis of claims under state constitutional law is similar to the analysis under the Fourth Amendment, no separate analysis will be undertaken for plaintiff's claims arising under the New Jersey Constitution."). The Court agrees with Judge Kugler's assessment.

33

Therefore, for any NJCRA claims asserted against the Township of Medford, the Medford Township Police Department, Chief of Police Kehoe, or Sergeant Lang, Defendants are awarded summary judgment for the reasons expressed in connection with the Section 1983 excessive force claims.  Conversely, the Motion for Summary Judgment against the excessive force claim against Corporal Zane is denied and that claim may proceed for the reasons expressed in connection with the Section 1983 claim asserted against him.

**E.   Loss of Consortium**

Lastly, the Court will address the loss of consortium claim set forth by Plaintiffs.  By Plaintiffs' estimation, James Jefferson may propound a loss of consortium claim against Defendants for the harm perpetrated upon his wife.  Plaintiffs believe that the per quod claim is actionable under the NJCRA, with its expansive protections.  Defendants argue otherwise, pointing to legal authority that negates a loss of consortium claim under Section 1983.

In Maudsley v. State of New Jersey, 816 A.2d 189 (N.J. App. Div. 2003), the Appellate Division of New Jersey, after noting that the Third Circuit has never addressed the issue directly, explained that "other federal circuit and district courts have held that claims for loss of consortium are not cognizable under § 1983." Id. at 207.  Bearing this authority in mind, the panel decreed: "We are persuaded that per quod claims for loss of consortium, purely

34

derivative under New Jersey law, are not cognizable under § 1983." Id. at 208.  Plaintiffs seem to acknowledge and cede to this authority, but nevertheless insist that a loss of consortium claim may be brought under the NJCRA.

The Court, however, rejects Plaintiffs' assertion.  Again, as explained above, the NJCRA closely mirrors Section 1983 jurisprudence, which does not provide a proper vehicle for a per quod claim.  Moreover, the Court accepts and incorporates the reasoning and holding enunciated in Armstrong v. Sherman, 2010 U.S. Dist. LEXIS 55616 (D.N.J. Jun. 4, 2010).  In that case, the Honorable Anne E. Thompson denied a loss of consortium claim under the NJCRA, relying on federal precedent and surmising that "[t]here is no reason to think that the New Jersey Supreme Court would hold that the state's constitution protects a husband or wife's right to marital comfort and spousal support." Id. at *16.  Judge Thompson added that "the language of the [NJCRA], like the language of 42 U.S.C. § 1983, appears to grant a cause of action only to those persons whose rights have been personally violated." Id.  In this case, only Grace Jefferson's rights, and not those of James Jefferson, have been personally violated.

Plaintiffs do not present any persuasive legal authority to counsel in favor of a different result.  Therefore, for those reasons, summary judgment against Plaintiffs' claim for loss of consortium is awarded to Defendants.

35

**IV.   CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted in part and denied in part.  Defendants are awarded summary judgment on all of Plaintiffs' federal and state claims against the Township of Medford, the Medford Township Police Department, and Chief of Police Kehoe, as well as Plaintiffs' claims alleging violations of the Fifth, Eighth, and Fourteenth Amendments and for loss of consortium.  With respect to the excessive force claims against Corporal Zane, Defendants are denied summary judgment.  Lastly, Plaintiffs' claims against Sergeant Lang are dismissed, without prejudice.  Plaintiffs shall have twenty (20) days from the date of this Opinion to amend their complaint or otherwise present an argument to demonstrate what, if any, claims exist against Lang.  Defendants shall have twenty (20) days following Plaintiffs' submission to respond.  An Order consistent with this Opinion shall be entered.


DATED: December 16, 2010            /s/ NOEL L. HILLMAN
At Camden, New Jersey           NOEL L. HILLMAN, U.S.D.J.